

# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT NASHVILLE

| | | |
|---|---|---|
| **Corey Bunton,** | ) | **Docket No. 2016-06-0333** |
| **Employee,** | ) | |
| **v.** | ) | |
| **Sanderson Pipe,** | ) | **State File No. 595-2016** |
| **Employer,** | ) | |
| **And** | ) | |
| **Bridgefield Casualty Insurance Co.,** | ) | **Judge Kenneth M. Switzer** |
| **Carrier.** | ) | |

## COMPENSATION HEARING ORDER

This case came before the Court on April 9, 2018, for a compensation hearing. The central legal issue is the compensability of Corey Bunton's injury, specifically, whether he willfully failed to follow a safety rule while working for Sanderson Pipe. For the reasons below, this Court holds that Sanderson Pipe satisfied its burden regarding Mr. Bunton's failure to follow a safety rule. Therefore, the Court holds that Mr. Bunton is not entitled to benefits.

### History of Claim

Mr. Bunton worked for Sanderson Pipe, a manufacturer of PVC pipe, as a lead operator. On January 4, 2016, Mr. Bunton suffered a severe physical injury to his left hand and wrist and alleged a psychiatric injury, after he placed his left hand inside a machine known as a "beller" while it was running at work.

Mr. Bunton testified that, before the injury, the shift supervisor, Jason Manley, asked him to clean the drain on the beller because water was puddling on the floor below the machine.[1] The drain on the beller is located behind a safety guard and below a large mandrel. The mandrel is an insert that pushes heated PVC pipe outward, forming a bell-

---

[1] A factual dispute exists about how many times Mr. Manley asked Mr. Bunton to clean the drain on this particular shift. Whether it occurred once or twice is not relevant to the Court's decision.

1

shape on the end of the pipe, so that pipes may be connected. An operator stops the beller by pushing an "emergency stop" or "e-stop" button, which powers the machine down. In addition, the beller has a computer touchscreen with an "automatic stop" button, which places it in manual mode, so the parts stop moving, but the machine remains powered.

The parties disputed whether Mr. Bunton stopped the beller before the accident. Mr. Bunton testified that he hit the automatic stop button on the computer touchscreen and then the e-stop button before he placed his left hand on the other side of the guard, reaching toward the drain. He stated that he did not intend to leave the machine running. According to Mr. Bunton, after he placed his hand inside the machine in an attempt to clear the drain, the beller suddenly and inexplicably started up, catching his index finger in a sliding gate. He immediately stopped the machine using the e-stop and called for help. Mr. Bunton acknowledged that he did not tell the carrier's investigator during his recorded statement a few days after the accident that he stopped the machine. He explained at the hearing that he was heavily medicated at the time he gave the statement.

No one witnessed Mr. Bunton's actions to corroborate that he pressed either stop button before the accident. However, quality-control co-worker Brandon Conley was working nearby at the time of the injury. At the hearing, Mr. Conley reviewed a video of the accident and testified as to what he observed. He stated that, had Mr. Bunton pushed either of the two stop buttons before the injury, he would have heard a distinct release of air pressure from the machine and observed the pipes stop rolling. He did not hear or see any indication that the machine was stopped before the injury. He also pointed to a certain section of the machine that reacted when Mr. Bunton actually pushed the e-stop button.

Mr. Manley additionally testified about the beller in detail, pointing out in photographs the parts where Mr. Bunton's hand became trapped. He indicated that the actual trap point occurred behind a safety guard, so Mr. Bunton had to exert some effort to get his hand to that point.

The video of the accident showed the sequence of events in a lower right-hand corner enlarged section of the screen, zeroing in on the events leading up to the injury and following. The crucial timeframe was between 6:27:40 and 6:28:00 A.M. Significantly, the video did not show Mr. Bunton hitting a button on a touch screen or an e-stop before placing his hand in the beller. Mr. Conley identified a moving clamp immediately before the accident, which he said means the machine was still in automatic mode.

After Mr. Bunton's hand became trapped, Mr. Manley, Mr. Conley and others came to his immediate aid. Their attempt to remove Mr. Bunton's hand manually caused further injury. His hand remained entrapped for approximately one and one-half hours.

2

Mr. Manley testified that, during the extraction, Mr. Bunton "told me that he just thought he had it timed to where he could get could get in there and get his hand out in time." According to Mr. Manley, a day or two later at the hospital, Mr. Bunton said, "He knew it was his fault," and, "He just thought he'd be able to get to it before the cycle had finished." Mr. Conley similarly testified that, at the hospital visit, Mr. Bunton told them "he thought he had it timed out right . . . to get his hand out in time." Mr. Bunton explained he meant he was waiting for the pipe heaters to retract so as not to disrupt production. Both Mr. Manley and Mr. Conley testified that Mr. Bunton did not say he hit stop before the accident.

As for his training, Mr. Bunton testified he received two days of one-on-one training when he was first hired, including safety training. He acknowledged Sanderson Pipe "did a pretty good job" training him, and he knew the safety rules. Both Mr. Manley and the facility manager, Chris Kiser, trained him on the proper procedure for cleaning the drain. The proper procedure required stopping the machine, either via the e-stop or the automatic stop on the touchscreen.

Sanderson Pipe introduced several documents to support its assertion that Mr. Bunton appreciated the danger involved in violating safety rules. Mr. Bunton conceded that he received and signed a "Safety Memo," which states "employees are prohibited from placing any body part into machinery that starts automatically. This memo serves as a written policy that is to be followed to the letter." In addition, a "Plant-Wide Hazard Analysis" states, "There are parts on every section of the production lines that are moving where you could get your hand or finger caught in between and gets [sic] pinched." Mr. Bunton signed a document stating that he reviewed and received a copy of it. Likewise, he signed an acknowledgement that he received a copy of the instruction manual for the machine, stating that he read and understood the instructions, including a warning about inserting body parts into moving machinery. Mr. Bunton testified that he understood the danger of placing his hand inside moving machinery. Mr. Bunton further acknowledged that the beller had four large "caution" signs.

Sanderson Pipe produced four written reprimands to demonstrate that it enforced this rule. Mr. Bunton received two of them, in January 2016 and September 2015. As for the January 2016 write-up, it does not mention that he stopped the beller before placing his hand inside it. The 2015 violation was for "[p]lacing hand on moving parts of machinery causing injury to finger." Mr. Bunton explained that he was loading gaskets on a moving machine, and he followed proper procedure. However, Mr. Manley testified that he believed Mr. Bunton violated the rule. As for the other write-ups, Mr. Kiser acknowledged that he received one for placing a body part in moving machinery. Sanderson also introduced a write-up for Billy Raulerson for violating the rule.

Sanderson Pipe denied Mr. Bunton's claim shortly after the accident, providing no workers' compensation benefits.

3

Mr. Bunton's injury resulted in the amputation of his left index finger, arthrodesis of his middle finger, fracture to his wrist and laceration to his ring finger. He required extensive treatment and did not reach maximum medical improvement for the hand injury until January 9, 2017. Mr. Bunton underwent an independent medical examination with Dr. Steven Neely, who placed a thirteen-percent impairment rating to the body as a whole. Dr. Neely further found the past treatment and bills associated with it reasonable and necessary. In addition, Mr. Bunton underwent an independent medical examination with Dr. Gregory Kyser regarding his alleged psychiatric impairment. Dr. Kyser assigned a five-percent impairment. Sanderson Pipe did not dispute Dr. Neely's findings but challenged Dr. Kyser's, although it did not introduce any expert proof to rebut his opinion.

## Findings of Fact and Conclusions of Law

Mr. Bunton has the burden of proof on all essential elements of his claim. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff,* 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015).

The parties stipulated that Mr. Bunton sustained an injury by accident arising primarily out of and in the course and scope of employment, subject to Sanderson Pipe's affirmative defense of willful misconduct under Tennessee Code Annotated section 50-6-110(a)(1). Under section 50-6-110(b), the burden of proof falls on Sanderson Pipe to establish its defense. To prevail on its affirmative defense, Sanderson Pipe has the burden of establishing four elements: (1) "the employee's actual, as opposed to constructive, notice of the rule"; (2) "the employee's understanding of the danger involved in violating the rule"; (3) "the employer's bona fide enforcement of the rule"; and (4) "the employee's lack of a valid excuse for violating the rule." *Roper v. Allegis Grp.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 14, at *7 (Feb. 10, 2017).

Turning to the first and second factors, Mr. Bunton testified that he knew Sanderson Pipe's safety rules and specifically that it prohibited placing body parts in moving machinery. He also signed acknowledgements of the Safety Memo and the Hazard Analysis, both of which contain variations of the written rule. The Court finds that Mr. Bunton knew the rule. Mr. Bunton also testified that he understood the hazards of placing body parts in machinery while in operation, and he agreed that he read and understood the Safety Memo, Hazard Analysis and beller instruction manual. The Court finds he understood the danger involved in violating the rule.

Third, the Court finds that Sanderson Pipe engaged in bona fide enforcement of

4

the rule, both before and after Mr. Bunton's injury. Mr. Bunton disputed whether it applied to his October 2015 incident; regardless, Sanderson Pipe unquestionably enforced it against Mr. Raulerson, Mr. Kiser, and Mr. Bunton for the January 2016 accident.

As for the fourth factor, Mr. Bunton claimed he did not violate the rule because he turned the machine off before placing his hand inside. However, the Court cannot find that Mr. Bunton stopped the beller before the accident. Mr. Bunton's testimony is inconsistent with the statement he gave the investigator. The Court is further persuaded by the credible testimony of Mr. Manley and Mr. Conley, who both stated that Mr. Bunton said he thought he "timed it right," and that he never told them he stopped the machine before the accident. Moreover, Mr. Conley testified that he did not see or hear the beller stop. But perhaps the most persuasive evidence is the video, where, to the Court's viewing, Mr. Bunton bypassed the computer screen and e-stop without a glance and proceeded to insert his hand inside the machine.

Alternatively, Mr. Bunton asserted that he did not intend to leave the beller running when he placed his hand inside it. Citing *Roper,* he argued that the Court should not merely apply the four-factor test, above, but it should also focus on the "willfulness" of his actions. Mr. Bunton asserted he did not "intentionally" decline to follow the safety rule, but rather he was either victim to a "freak accident" when the machine started up on its own, or he "made a careless mistake at the end of a twelve-hour shift."

The Court disagrees with this interpretation of *Roper.* The Appeals Board explained:

> [T]he Supreme Court in *Mitchell* [*v. Fayetteville Pub. Utils.,* 368 S.W. 442 (Tenn. 2012),] reinforced longstanding precedent that an employee's negligent or reckless actions generally are not enough to defeat a claim for workers' compensation benefits. In seeking to establish the fourth element of the *Mitchell* test, an employer must come forward with evidence that the employee *intended* to take the action that violated the known safety rule without a valid excuse.

2017 TN Wrk. Comp. App. Bd. LEXIS 14, at *11-12 (emphasis in original.) Thus, Sanderson Pipe must produce evidence that Mr. Bunton intended to take the action that violated the known safety rule without a valid excuse. The Court holds it did, based again on a viewing of the video but also on Mr. Manley's testimony about the effort required for Mr. Bunton to place his hand where the injury occurred. The Court finds Mr. Bunton intended to place his hand inside the moving machine in violation of the safety rule, and he offered no valid excuse for doing so.

Therefore, this Court holds that Sanderson Pipe established, by a preponderance of the evidence, that Mr. Bunton willfully failed to follow a safety rule. Mr. Bunton's claim

for workers' compensation benefits is denied.

## Alternative Findings

Solely in the event that an appellate body finds error in the compensability holding, the Court makes the following alternative findings for the sake of judicial economy. *See Cunningham v. Shelton Sec. Serv.,* 46 S.W.3d 131, 137-138 (Tenn. 2001). ("The trial court should . . . hear the entire case and make appropriate findings of fact, and alternative findings when necessary, for appellate review.")

The Court holds in the alternative that Mr. Bunton suffered a thirteen-percent physical impairment and a five-percent psychiatric impairment. Therefore, according to the American Medical Association Guides to the Evaluation of permanent Impairment, Sixth Edition, Appendix A Combined Values Chart, he suffered a seventeen-percent impairment to the body as a whole, for purposes of computing an award or permanent partial disability benefits. As for temporary total disability benefits, he reached maximum medical improvement on January 8, 2017. Mr. Bunton's compensation rate is $459.13. Further, all past treatment, and the resulting bills, were reasonable and necessary.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mr. Bunton's claim is denied on the ground of compensability.

2. Sanderson Pipe shall pay the $150.00 filing fee under Tennessee Compilation Rules and Regulations 0800-02-21-.07 (2016) within five days of entry of this order.

3. Sanderson Pipe shall file an SD-1 within five days of entry of this order.

4. Absent an appeal of this order, it shall become final thirty days after issuance.

**ENTERED April 11, 2018.**

6

**JUDGE KENNETH M. SWITZER**
**Court of Workers' Compensation Claims**

## APPENDIX

EXHIBITS: Employee
    A. Standard Form Medical Report C-32 with attachments (25 pages)
    B. Deposition of Greg Kyser, M.D. with exhibits

EXHIBITS: Employer
    A. Sanderson Pipe Safety Memo (2 pages)
    B. Sanderson Pipe Corporation Plant-Wide Hazard Analysis (3 pages)
    C. Training Log
    D. Owners Instructions and Information (40 pages)
    E. Collective Photographs (19)
    F. Video of accident
    G. Corey Bunton Personnel File, Home Depot (37 pages)
    H. Transcript of Recorded Statement of Corey Bunton (27 pages)[2]
        H.1. Audio recording.
    I. Sanderson Pipe Corporation training confirmation
    J. First Report of Injury
    K. Wage statement
    L. Notice of denial
    M. Safety Department-Accident Investigation Report
    N. Sanderson Pipe job description (3 pages)
    O. Employee's Responses to Interrogatories
    P. Deposition of Corey Bunton and Exhibits
    Q. Sanderson Pipe Corporation Notice of Violation of Rules, Policies or Procedures for Corey Bunton (9/28/15 and 1/8/16), Chris Kiser (8/3/06) and Billy Raulerson (6/9/08)
    R. Witness Statements: Joshua Hogan, Jason Manley, Brandon Conley (5 pages)

---

[2] Mr. Bunton objected to the admissibility of this document at the compensation hearing. The Court overruled the objection because the parties stipulated to the admissibility of all documents at the Pretrial Conference.

5. Petition for Benefit Determination, March 1, 2017[3]
6. Dispute Certification Notice, April 17, 2017
7. Employer's Pre-Compensation Hearing Brief with Exhibits
8. Joint Pre-Compensation Hearing Statement (without Exhibits)

---

[3] The previous practice of the Court of Workers' Compensation Claims and Mediation and Ombudsman Services of Tennessee for parties to schedule post-discovery mediation required the filing of a second petition for benefit determination.

## CERTIFICATE OF SERVICE

I certify that a copy of the Compensation Hearing Order was sent to these recipients by the following methods of service on April 11, 2018.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|----------------|---------|-----------|------------------|
| Zach Wiley, Employee's attorney | | | X | zwiley@forthepeople.com mlucas@forthepeople.com |
| Cate Dugan, Employer's attorney | | | X | cate@petersonwhite.com |

Penny Shrum, Clerk of Court
wc.courtclerk@tn.gov

9